FILED & ENTERED

NOV 29 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY gonzalez DEPUTY CLERK

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re: Arto Atmadjian, Debtor | Case No.: 2:16-bk-12145-ER<br>Adv. No.: 2:16-ap-01250-ER |
| Linda Strause, David Strause, and Colin Strause,<br>Plaintiffs<br>v.<br>Arto Atmadjian,<br>Defendant | **MEMORANDUM OF DECISION FINDING THAT DEFENDANT'S INDEBTEDNESS TO PLAINTIFFS, IN THE AMOUNT OF $28,500, IS EXCEPTED FROM DISCHARGE**<br><br>**TRIAL:**<br>Date: August 1, 2017<br>Time: 9:00 a.m.<br>Location: Ctrm. 1568<br>Roybal Federal Building<br>255 East Temple Street<br>Los Angeles, CA 90012 |

## I. Introduction

Plaintiffs Linda Strause, David Strause, and Colin Strause contend that Defendant Arto Atmadjian is liable in the amount of $29,500 for making false representations, engaging in embezzlement, and inflicting willful and malicious injury in connection with jewelry transactions between Plaintiffs and Defendant. Plaintiffs seek a determination that Defendant's alleged indebtedness is excepted from discharge pursuant to §523(a)(2)(A), (a)(4) (on the grounds of embezzlement), and (a)(6).

Trial was conducted on August 1, 2017.[1] The parties filed closing briefs on October 20, 2017. *See* Doc. Nos. 71–72. This Memorandum of Decision constitutes the Court's findings of fact and conclusions of law pursuant to Civil Rule 52, made applicable to these proceedings by Bankruptcy Rule 7052.[2] For the reasons set forth below, the Court finds that Defendant is indebted to Plaintiff Colin Strause in the amount of $14,500 and is indebted to Plaintiffs Linda and David Strause in the amount of $14,000, and that such indebtedness is excepted from discharge pursuant to §523(a)(2)(A), (a)(4) (on the grounds of embezzlement), and (a)(6).

## II. Findings of Fact[3]

Linda and David Strause, a married couple, became regular customers of Tala Jewelers ("Tala") in November 2010. Trial Transcript ("Tr.") [Doc. No. 68] at 7:14–8:2. At that time, Linda and David[4] lived directly across the street from Tala. Tr. 7:19–22. Between November 2010 and July 2013, Linda and David purchased more than $340,000 in jewelry from Tala. Tr. 15:6–8 (testimony of Linda). Linda and David became friends with Arto, an officer of Tala, and would frequently visit Tala. After Tala experienced an armed robbery, Linda and David took Arto and his family out to dinner at Locanda Portofino, an upscale Italian restaurant in the neighborhood. Tr. at 11:5–12 (testimony of Linda); *id.* at 116:24–117:10 (testimony of David). Linda and David would frequently visit Tala on Sunday afternoons for snacks and champagne, and would often purchase jewelry during these visits. Tr. at 116:13–23 (testimony of David). Arto would give Linda and David gifts on their birthdays and wedding anniversaries. Tr. at 11:5–12 (testimony of Linda).

In August 2013, Linda and David delivered various items of jewelry (the "Delivered Jewelry") to Arto. Joint Pretrial Order ("Pretrial Order") [Doc. No. 44] at ¶117. The primary disputed issue of fact concerns the purpose of this transaction. Linda and David assert that Arto had agreed to sell the Delivered Jewelry on Linda's behalf, because Linda no longer wore the items. Arto maintains that the Delivered Jewelry was intended to partially satisfy Linda and David's outstanding indebtedness to Tala. According to Arto, Linda and David had a substantial outstanding balance at Tala at the time of the transaction; much of the balance was attributable to a 10.5 caret ruby ring (the "Ruby Ring") that Arto asserts Linda and David purchased on August 18, 2012. Linda and David deny purchasing the Ruby Ring, and contend that the invoice evidencing the purchase of the Ruby Ring is a forgery. There is no dispute that Arto never returned any of the Delivered Jewelry to Linda and David, and that Arto never remitted any proceeds from the sale of the Delivered Jewelry to Linda and David.

The parties also dispute the purpose of a transaction involving a white gold Rolex watch (the "White Gold Watch") belonging to Colin Strause, Linda and David's son. Colin contends that he

[1] A transcript of the proceedings is available as Doc. No. 68 and is cited as "Tr."

[2] Unless otherwise indicated, all "Civil Rule" references are to the Federal Rules of Civil Procedure, Rules 1–86; all "Bankruptcy Rule" references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037; all "Evidence Rule" references are to the Federal Rules of Evidence, Rules 101–1103; and all statutory references are to the Bankruptcy Code, 11 U.S.C. §§101–1532.

[3] To the extent any findings of fact should more properly be characterized as conclusions of law, they shall be deemed as such. To the extent any conclusions of law should more properly be characterized as findings of fact, they shall be deemed as such.

[4] Given names are used to distinguish parties with the same surname. No disrespect is intended.

gave the watch to Arto to sell on his behalf because he wanted to use the proceeds to buy a better watch. Arto testified that Colin gave him the White Gold Watch to satisfy Linda and David's outstanding indebtedness to Tala. There is no dispute that the White Gold Watch was not returned to Colin and that Arto never remitted any proceeds from the sale of the White Gold Watch to Colin.

For the reasons explained below, the Court finds that Linda and David did not purchase the Ruby Ring and that Linda and David gave the Delivered Jewelry to Arto in August 2013 with the understanding that Arto would sell the Delivered Jewelry on their behalf. Similarly, the Court finds that Colin gave Arto the White Gold Watch so that Arto could sell it on his behalf.

**A. Linda and David Did Not Purchase the Ruby Ring**

As set forth in greater detail below, Arto testified that Linda and David purchased the Ruby Ring from Tala on August 18, 2012, for $91,000. Linda and David both denied purchasing the Ruby Ring. For the following reasons, the Court finds that Linda and David did not purchase the Ruby Ring.

First, with the exception of the Ruby Ring, the parties have stipulated to the dates upon which Linda and David purchased jewelry from Tala, the amounts of the purchases, and the payments that were made on account of the purchases.[5] Between 2010 and 2012, Linda and David made jewelry purchases from Tala on 42 separate dates.[6] With the exception of a purchase on January 3, 2011, Linda and David made a credit card payment to Tala either on the same date as the purchase, or on the same date that Linda and David took possession of the jewelry.[7] For the January 3, 2011 purchase, Linda and David made a credit card payment on January 8, 2011, shortly after the date of the purchase. The credit card payment would not always cover the full amount of the purchase, but in all instances Linda and David made at least partial payment. Had Linda and David purchased the Ruby Ring on August 18, 2012, it would have been only the second time in their entire course of dealing with Tala that Linda and David did not make some type of credit card payment on the same date that they took possession of the purchased jewelry.[8]

Second, the Ruby Ring cost far more than any of the other jewelry purchases that Linda and David made from Tala. The Ruby Ring was priced at $91,000. The most that Linda and David

---

[5] Unless otherwise indicated, the dates upon which Linda and David purchased jewelry, and the amounts of those purchases, are derived from the Pretrial Order to which the parties stipulated.

[6] On some of the dates, Linda and David purchased more than one item of jewelry. For these dates, the record contains more than one sales receipt and credit card receipt evidencing the purchases.

[7] At least one of the purchases consisted of repairs and refurbishment to existing jewelry. The jewelry was dropped off at Tala on the purchase date but Linda and David did not take possession of the jewelry or make a payment on account of the purchase until later, after the repairs had been made.

[8] Linda and David made a purchase in the amount of $22,611.75 on August 18, 2012, Pretrial Order at ¶89, but did not take possession of the purchased jewelry until approximately one week later, at which time they made a payment to Tala in the amount of $30,000, Pretrial Order at ¶90. The purchase consisted of the repair and enhancement of jewelry Linda already owned, which explains the week delay between the date of the purchase and the date Linda and David took possession of the refurbished jewelry. Tr. 207:21–208:7 (testimony of Arto); Tr. 76:6–10 (testimony of Linda).

spent at Tala on a single day was $36,086.75, on July 20, 2012. Even the July 20 purchase was an outlier; on 24 of the 42 days upon which Linda and David made purchases, they did not spend more than $12,500.[9] Linda credibly testified that she did not have any insurance for the Ruby Ring and that she would not have purchased an item of jewelry so expensive unless it were insured. Tr. 29:5–9. Linda's custom was to purchase insurance for her more expensive jewelry. For example, Linda had insurance on fifteen items of jewelry; the coverage limits for the insured jewelry ranged from $2,900 to $48,500. Tr. 32:22–34:3 and Ex. 105.

Third, having observed the demeanor of both Linda and Arto, the Court simply finds Linda's testimony that she did not purchase the Ruby Ring to be more plausible than Arto's testimony that she did. Linda testified that she tried on the Ruby Ring on August 18, 2012, and that prior to that date, Arto had been trying to convince her to buy the Ruby Ring:

> Prior to [August 18, 2012] we had mentioned that in September 2013 it was going to be [my] ruby wedding. We would be married for 40 years and the stone associated with that is ruby. So when we went in on this day [in] October—it was a beautiful ring. I mean, it was $91,000. It'd better be beautiful. And he [Arto] had me try it on and I tried it on and I gave it him back and he put it back in his safe…. And the ruby ring was ridiculously expensive but every time we went in, he would bring this ring out and had me try it on in the store. And I'd give it him back and he would put it back in the safe…. I told him that we weren't going to purchase it and I told him that he should put it in his display case so that someone could purchase it, but he just kept putting it back in his safe.

Tr. 28:8–23.

Linda vehemently denied purchasing the Ruby Ring:

> **Question [by Plaintiffs' Counsel]:** You're certain that you didn't leave his store, Tala Jewelers, with that ruby ring?
>
> **Answer:** I most certainly would never have left the store with a $91,000 ring that I had no insurance on and that didn't belong to me….
>
> **Question:** Now, [Arto] also testified about this ruby ring. Do you remember his testimony on the stand just a little bit ago?
>
> **Answer:** Yes, I do.
>
> **Question:** And he indicated that you came into the store and you purchased it and you walked out with it?
>
> **Answer:** I never once ever left that store with that ring. Never. I remember hearing him say that, but it's not true.

---

[9] Linda and David spent less than $12,500 at Tala on all of the following dates (the total amount spent is in parenthesis following the date): February 17, 2011 ($768.25), February 26, 2011 ($10,920.12), March 5, 2011 ($740.81), April 20, 2011 ($1,212.75), June 6, 2011 ($2,587.20), July 11, 2011 ($1,345.96), August 12, 2011 ($9,111.45), August 30, 2011 ($5,462.50), September 9, 2011 ($812.50), October 7, 2011 ($9,725.00), December 16, 2011 ($8,674.45), December 22, 2011 ($2,269.10), January 18, 2012 ($2,403.50), February 11, 2012 ($764.25), February 25, 2012 ($300.00), March 12, 2012 ($7,220.00), April 10, 2012 ($7,220.00), April 18, 2012 ($8,849.25), May 13, 2012 ($10,903.15), July 1, 2012 ($4,479.25), August 6, 2012 ($3,740.00), November 24, 2012 ($3,114.00), January 29, 2012 ($250.00), and July 21, 2013 ($2,450.00). A chart containing all of the jewelry purchases to which the parties stipulated in the Pretrial Order is attached hereto as Appendix D.

> **Question:** And he also says that he saw you from across the street and you were waving your hand with the ring on and flashing it. Did that ever happen?
>
> **Answer:** No.
>
> **Question:** Did you ever have the ring in your possession outside the store?
>
> **Answer:** Not outside the store.
>
> **Question:** Would you have worn that ring to a lunch down the street from your house?
>
> **Answer:** No.
>
> **Question:** Why not?
>
> **Answer:** Because I wouldn't wear a ring like that. I would be afraid it got [sic] stolen.

Tr. 29:5–9, 234:15–235:10.

Arto's own testimony corroborated Linda's account of Arto's vigorous attempts to sell Linda the Ruby Ring:

> And then while she [Linda] had the ring on, me [Arto] obviously a salesman, I put the ruby bracelet on her as well because it wasn't the same thing but it was—you know, it was a ruby and diamond bracelet and it was matching. So I put the bracelet on. She goes, you know, she loved it also. "Okay," I said, "Don't worry. I'll make your guys a special deal," and I wrote that first invoice and that was it.

Tr. 206:8–15.

Linda confirmed that as part of his sales pitch, Arto created an invoice showing how much the Ruby Ring would cost:

> To start with, the receipt from August whatever date it was, was because he wanted us to buy those two items [the Ruby Ring and another item of jewelry] and he wrote it up. We didn't take the items out of the store. The ruby ring was kept in his safe. It went back in his safe. And when I came in on a Sunday he'd bring this ring out and say, "Oh, here's your ring. Try it on," and we did not buy that ring. We never took that ring out of the store.

Tr. 241:15–22.

Linda and David produced a yellow carbon copy duplicate of the invoice that Arto created in an attempt to convince Linda to buy the Ruby Ring (the "Carbon Copy August 2012 Invoice") (Ex. 108) (attached hereto as Appendix A). Arto testified that Linda's possession of the Carbon Copy August 2012 Invoice establishes that she must have purchased the Ruby Ring:

> **Question [by Defendant's Counsel]:** By the way, since this invoice [the Carbon Copy August 2012 Invoice] lists the two items that the Strauses say they never purchased from you … would there be any reason for them to have this invoice?
>
> **Answer:** Absolutely not.
>
> **Question:** Is that because you believe they did purchase both items?
>
> **Answer:** They wouldn't have the invoice if they didn't—if—they wouldn't have the invoice if they didn't pick it up.

Tr. 226:12–23.

Contrary to Arto's assertion, the Court finds that Linda's possession of the Duplicate August 2012 Invoice does not show that she must have purchased the Ruby Ring. The Court finds that Arto created the Carbon Copy August 2012 Invoice as part of his sales pitch to convince Linda and David to buy the Ruby Ring. As of August 18, 2012, Linda and David had purchased more than $300,000 worth of jewelry from Tala. Arto thought that he could talk Linda and David into

buying the Ruby Ring, and wrote up the Carbon Copy August 2012 Invoice to try to close the sale.[10]

Two additional invoices proffered by Arto do not show that Linda and David purchased the Ruby Ring. The first additional invoice bears some resemblance to the Carbon Copy August 2012 Invoice, but contains additional jewelry items that do not appear on the Carbon Copy August 2012 Invoice, and also contains numerous strikethroughs not present on the Carbon Copy August 2012 Invoice (the "Augmented August 2012 Invoice") (Ex. E) (attached hereto as Appendix B). Arto testified that the Augmented August 2012 Invoice is the invoice that he originally created on August 18, 2012, but with additional annotations that he made during the subsequent weeks to reflect further purchases by Linda and David. Tr. 168:23–173:1. Arto stated that Linda and David were present each time he made additional annotations to the Augmented August 2012 Invoice. Tr. 169:3–15, 170:20–171:8.

The second additional invoice is dated "8/18/12" but was created in December 2012 (the "December 2012 Invoice") (Ex. 73) (attached hereto as Appendix C).[11] Arto claimed that he created the December 2012 Invoice so that Linda and David would have a clean invoice of the August 18 transaction that was not cluttered with strikethroughs. Tr. 173:16–21. Linda testified that prior to this litigation, she had never seen either the Augmented August 2012 Invoice or the December 2012 Invoice. Tr. 232:3–233:17.

With respect to the additional invoices, the Court finds Linda's testimony to be more credible than Arto's. The Court finds that Linda did not see either invoice prior to this litigation. Accordingly, neither invoice shows that Linda and David purchased the Ruby Ring. In addition, the Court's finding that Arto's version of events is not credible is bolstered by Arto's decision to create the December 2012 Invoice. During the entire course of dealing between Linda and David and Arto, Arto produced invoices contemporaneously with each sale. The December 2012 Invoice is the only invoice that was produced months after the purported transaction. Arto claimed that he created the December 2012 Invoice so that Linda and David would have a clean record of the transaction, but even Arto acknowledged that Linda and David never requested a new invoice with respect to the August transaction. Tr. 174:5–15 (testimony of Arto).

In support of his claim that Linda and David did purchase the Ruby Ring, Arto asserts that absent the purchase of the Ruby Ring, Linda and David would have had a credit balance at Tala of approximately $31,000 as of January 29, 2013. Citing Linda's testimony that she never prepaid for merchandise at Tala, Tr. 62:15–21, Arto contends that the existence of a credit balance absent the purchase of the Ruby Ring shows that Linda and David must have purchased the Ruby Ring. Arto calculates the asserted credit balance based upon the jewelry purchase dates and amounts that the parties stipulated to for purposes of this trial.

---

[10] The Carbon Copy August 2012 Invoice contains the words "not wanted" in black ink next to the entry for the Ruby Ring. Both Arto and Linda denied writing in the words "not wanted." Tr. 225:24–226:11 (Arto's testimony); Tr. 231:8–18 (Linda's testimony). The Court makes no finding as to who was responsible for the "not wanted" annotation.

[11] At trial, the Court stated that the December 2012 Invoice did not qualify as a record of a regularly conducted activity under Evidence Rule 803(6)(A), and was therefore not admissible, because it was not created at or near the time of the August 18, 2012 transaction. TT 246:16–22. The December 2012 Invoice is not admitted for the purpose of establishing which items of jewelry that Linda and David purchased from Tala on August 18, 2012. However, the Court does consider the December 2012 Invoice for the purpose of assessing Arto's credibility.

It is true that, based upon calculations derived from the purchase history that the parties stipulated to for trial purposes, Linda and David had a credit balance at Tala of $31,558.50 as of January 29, 2013. (The stipulated purchase history, including the purchase amounts and the running credit balance, is attached hereto as Appendix D.) The stipulated purchase history also indicates that as of the date of Linda and David's final purchase from Tala, Linda and David had a credit balance of $16,759.50.

The fact that the stipulated purchase history yields a credit balance does not outweigh all the other evidence that Linda and David did not purchase the Ruby Ring. First, it was not established that the stipulated purchase history reflected every single transaction between the parties. Linda testified that not all purchases she made from Tala were reflected in the exhibit binder from which the stipulated purchase history was derived:

> **Question [by Plaintiffs' Counsel]:** Are there any other purchases that are made that are not reflected in the invoices that are set forth in this binder?
>
> **Answer:** From my list of credit card charges I came across a couple of items that didn't seem to be there.

Tr. 8:25–9:4.

Second, testimony elicited at trial from both Plaintiffs Linda and David and Defendant Arto showed that none of the parties engaged in exemplary record keeping practices with respect to their business relationship. For example, Linda's testimony established that she did not keep records of her purchases from Tala and made payments based on what Arto said was owed:

> **Question [by Plaintiffs' Counsel]:** Did you ever receive—say not monthly—at any time did you receive statements advising as to what your balance was?
>
> **Answer:** The only statement we ever got was after we hired a lawyer and then the statement was sent supposedly December which was addressed to our old address that we weren't even living there anymore. That was the first statement we ever saw.
>
> **Question:** So when you made payments to Tala Jewelers how did you determine how much the amount was—amount of the payment you would make?
>
> **Answer:** Sometimes he would say, can you pay $10,000 on the account and—
>
> **Question:** And you would just make whatever payment [Arto] told you?
>
> **Answer:** Yeah.
>
> **Question:** And what—did you ever ask for documentation as to what the balance was?
>
> **Answer:** No, stupidly we didn't.
>
> **Question:** Was there a reason you didn't ask [Arto] for the balance when you made the payment? You were making significant payments, $10,000, $7,500, sometimes more than that.
>
> **Answer:** We trusted him.
>
> **Question:** You were making these payments at his word?
>
> **Answer:** That's correct.

Tr. 91:4–92:4.

Nor were Arto's record-keeping practices problem-free, as demonstrated by the dispute over the multiple invoices purporting to memorialize the August 18, 2012 transaction (discussed above), as well as Arto's failure to provide Linda and David with any written record of their outstanding balance prior to the commencement of this litigation. As David testified:

> **Question [by Plaintiffs' Counsel]:** Okay. And did you ever receive monthly statements from [Arto] indicating monies that were owed?

> **Answer:** Oh, heavens no.
>
> **Question:** Did you ever see—receive account statements or any type of balances or anything in writing from him?
>
> **Answer:** No, because usually when we were doing business with him he had—he was trying to get his computer system set up and it wasn't really completed when we were there and when we stopped doing business with him. But after we had contacted our attorneys and got that ball rolling then all of a sudden these statements appear out of magic, you know, come out of the space.

Tr. 121:23–122:10.

In addition, there was no dispute that neither Plaintiffs or Defendant created any records contemporaneous with the transactions involving the Delivered Jewelry or the White Gold Watch.

Given that both Plaintiffs and Defendant were less than diligent in terms of maintaining written records of their business relationship, any inferences that can be drawn from the stipulated purchase history with respect to the Ruby Ring are entitled to only minimal evidentiary weight. Accordingly, the Court rejects Defendant's assertion that the credit balance reflected by the stipulated purchase history compels the conclusion that Linda and David must have purchased the Ruby Ring.

**B. Linda and David Gave Arto the Delivered Jewelry with the Intent that Arto Sell the Jewelry on Their Behalf, Not to Satisfy Outstanding Indebtedness**

The Court finds that Linda and David gave Arto the Delivered Jewelry with the intent that Arto sell the jewelry on their behalf. This finding follows from the finding that Linda and David did not purchase the Ruby Ring. The parties agree that absent the purchase of the Ruby Ring, Linda and David would not have owed Tala any money as of August 2013, the date Linda and David gave Arto the Delivered Jewelry.

The Court finds Linda's description of the transaction involving the Delivered Jewelry to be credible:

> **Question [by Plaintiffs' Counsel]:** And did [Arto] agree to sell your jewelry on your behalf?
>
> **Answer:** Yes, I had—I have said to him I was thinking of selling some of my—selling some of the jewelry that I never wore. And he said that he could handle that, that he had contacts with other jewelers and he would—he would sell it or he said he would put it on consignment in his store and not charge any fee for it. But I thought that that made no sense because why would he try to sell our jewelry and make nothing when he had other pieces by the same manufacturer in his store. So when he said that he could—he had someone in I believe New York who would buy it, I said fine and I agreed to that.

Tr. 34:21–35:6.

Linda testified that the agreement was that Linda and David would receive $14,000 from the sale of the Delivered Jewelry and that Arto would retain any sales proceeds in excess of $14,000. Tr. 84:1–5.

Arto denied that he ever agreed to sell the Delivered Jewelry on Linda and David's behalf, Tr. 214:5–217:2, and argues that he would have received no economic upside from such a transaction. That argument is not persuasive. Arto would have been entitled to keep any sales proceeds in excess of $14,000. Even if Arto did not anticipate a significant gain in connection

with the transaction, he could have been motivated by the desire to cultivate a relationship with two customers who had been highly profitable.

**C. Colin's Watches Were Not Provided to Arto for the Purpose of Satisfying Linda and David's Indebtedness Tala**

Colin testified that he gave his parents Linda and David two of his watches to deliver to Arto in August 2013. Tr. 100:24–101:8. One watch was a white gold Rolex watch (the "White Gold Watch") and the other was a crocodile-banded Rolex watch (the "Crocodile Band Watch"). Tr. 100:1–11 (testimony of Colin). Colin stated that he was no longer using either watch, that he wanted to sell the watches and use the money to buy a better watch, and that he instructed his parents to deliver the watches to Arto based on their relationship with him. Tr. 100:1–101:18. Colin testified that one to two weeks after the watches were delivered to Arto, he decided that he no longer wanted to sell the White Gold Watch, and that Arto returned the White Gold Watch to him. Tr. 102:19–25. Colin testified that Arto returned the Crocodile Band Watch to him at approximately the same time because Arto was unable to sell the Crocodile Band Watch. Tr. 103:1–5.

There is no dispute that Arto visited Colin, Linda, and David's visual effects company, Hydraulx, on October 1, 2013, and picked up the White Gold Watch. Colin testified that he had changed his mind again and decided that he did want to sell the White Gold Watch. Tr. 103:13–18. The exact date of Arto's visit is known because all visitors to Hydraulx are required to sign a non-disclosure agreement before entering the premises. Tr. 103:23–104:24 (testimony of Colin). Colin testified that he personally delivered the White Gold Watch to Arto, with the understanding that Arto was to sell the watch and remit the proceeds to him. Tr. 104:12–105:13. Arto denied picking up the White Gold Watch from Colin. Tr. 191:1–3. Arto testified that it was David who gave him the White Gold Watch and that he believed the watch was David's when he received it. Tr. 191:5–10. Arto maintained that the White Gold Watch was provided to him for the purpose of satisfying outstanding indebtedness that Linda and David owed to Tala. Tr. 191:11–16. There is no dispute that the White Gold Watch was not returned to Colin and that Arto never remitted any proceeds from the sale of the White Gold Watch to Colin, Linda, or David.

The Court found Colin's testimony to be especially credible. Colin testified that when he gave the White Gold Watch to Arto, he did not ask for any documentation to memorialize the transaction, because "honestly, it was a pretty small transaction, in my eyes, so it was just, you know, I handed him the watch and I just had to get back to work." Tr. 106:2–5. Colin testified that he did not aggressively pursue the return of the White Gold Watch, because "[i]t was kind of a small transaction in the grand scheme of things, so it became more of a nuisance." Tr. 107:3–10. Colin's demeanor at trial was consistent with this testimony; Colin seemed more annoyed about being required to take time away from work at his special effects business[12] in order to testify than he did about the loss of the White Gold Watch. Corroborating his claim that the transaction with Arto was "pretty small," Colin testified that at approximately the same time, he had sold another watch he owned for $65,000. Tr. 112:10–14.

---

[12] Colin testified that his company Hydraulx produces special effects for Hollywood blockbusters, and that he and his brother have directed two movies and dozens of commercials and music videos. Tr. 98:25–99:3.

The Court finds that on October 1, 2013, Colin gave the White Gold Watch to Arto, pursuant to an agreement between Colin and Arto under which Arto would sell the watch and remit the sales proceeds to Colin. The Court finds that the transaction involving the Crocodile Band Watch—which was returned to Colin—was entered into for the same purpose.

**D. Arto's Remaining Arguments Lack Merit**

Arto advances additional arguments in support of his contention that he never agreed to sell any jewelry on behalf of Linda, David, and Colin, and that the jewelry provided to him was intended to be applied as a credit to Linda and David's outstanding indebtedness to Tala. None of Arto's arguments have merit.

First, Arto notes that Linda did not create any documentation evidencing the agreement to sell the Delivered Jewelry on Linda and David's behalf. Arto argues that Linda, having substantial business experience as Chief Financial Officer at the family's visual effects studio, Hydraulx, would have created some sort of writing to evidence the transaction had it occurred.

Arto's argument overlooks the close and friendly relationship between the parties at the time the transaction occurred. Linda testified that she did not create any contemporaneous written documentation of the transaction because she trusted Arto. Tr. 83:10–13. That testimony is credible; there was no dispute that at the time of the transaction, the parties had a close personal relationship. As noted previously, Linda and David had taken Arto and his family to dinner at an upscale Italian restaurant, Tr. 11:5–12; Linda and David would frequently visit Tala on Sunday afternoons for snacks and champagne, Tr. 116:24–117:10; and Arto would give Linda and David gifts on their birthdays and wedding anniversaries, Tr. 11:5–12. Under these circumstances, there is nothing anomalous about Linda's failure to demand contemporaneous written documentation of the transaction.

Second, Arto points to Linda's acknowledgement that she never made any insurance claim with respect to the Delivered Jewelry, Tr. 87:19–88:16, as well as Linda's acknowledgment that she did not send Arto an e-mail or letter demanding the return of the Delivered Jewelry until after retaining counsel, Tr. 88:19–90:5. Arto's theory is that Linda and David gave him the Delivered Jewelry to pay down their indebtedness to Tala, later regretted that decision, and subsequently fabricated the story that Arto had stolen the Delivered Jewelry.

Linda and David's failure to submit an insurance claim with respect to the Delivered Jewelry does not call their veracity into question. Linda testified that she reported the loss of the jewelry to the police and that the Delivered Jewelry was not insured, Tr. 87:19–88:13. And the fact that Linda did not personally send a demand letter to Arto is inconsequential, given that Linda and David engaged counsel to send a demand letter on their behalf, Tr. 90:7–8.

**E. Plaintiffs' Damages**

By failing to return the Delivered Jewelry or its sales proceeds to Linda and David, Arto is indebted to Linda and David in the amount of $14,000. By failing to return the White Gold Watch or its sales proceeds to Colin, Arto is indebted to Colin in the amount of $14,500.[13]

There is no material dispute with respect to the value of the Delivered Jewelry or the White Gold Watch. Linda testified that Arto had agreed that Linda and David would receive $14,000 from the sale of the Delivered Jewelry. Tr. 84:1–5. Arto's position is that the Delivered Jewelry

[13] Arto's indebtedness to Linda, David, and Colin is non-dischargeable for the reasons discussed in *Section III, Conclusions of Law*.

was worth $14,000. *See* Defendant's Post-Trial Brief [Doc. No. 72] at 16–17.[14] Colin testified that he was to receive between $14,500 and $15,000 for the White Gold Watch. Tr. 104:25–105:2. Arto's position is that the White Gold Watch was worth $14,500. *See* Defendant's Post-Trial Brief [Doc. No. 72] at 16–17.

## III. Conclusions of Law
A. Section 523(a)(4)

Section 523(a)(4) excepts from discharge debts arising from embezzlement. "Under federal law, embezzlement in the context of nondischargeability has often been defined as 'the fraudulent appropriation of property by a person to whom such property has been entrusted or into whose hands it has lawfully come.' Embezzlement, thus, requires three elements: '(1) property rightfully in the possession of a nonowner; (2) nonowner's appropriation of the property to a use other than which [it] was entrusted; and (3) circumstances indicating fraud.'" *Transamerica Comm. Finance Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991) (internal citations omitted). A creditor seeking to have a debt declared nondischargeable has the burden of proof under the preponderance of the evidence standard. *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654 (1991).

Plaintiffs have established that all the elements of embezzlement apply. Linda and David gave Arto the Delivered Jewelry with the understanding that Arto would sell the Delivered Jewelry on their behalf and remit to them $14,000 of the sales proceeds. Colin gave Arto the White Gold Watch with the understanding that Arto would sell the watch on his behalf and remit to him approximately $14,500 of the sales proceeds. (The Delivered Jewelry and the White Gold Watch are referred to collectively as the "Misappropriated Jewelry.") The Misappropriated Jewelry was rightfully in the possession of Arto, a nonowner. By selling the Misappropriated Jewelry and failing to remit any of the sales proceeds to Linda, David, and Colin, Arto appropriated the property to a use other than that for which it was entrusted. The transactions involving the Delivered Jewelry and White Gold Watch are both tainted by circumstances indicating fraud. First, Arto's representation that he would sell the Misappropriated Jewelry on Linda, David, and Colin's behalf, followed by his subsequent failure to remit any of the sales proceeds, is by itself sufficient indicia of fraud. Second, Arto created the December 2012 Invoice, which falsely represents that Linda and David purchased the Ruby Ring on August 18, 2012, and invented the story that Linda and David purchased the Ruby Ring—all for the purpose of covering up his misappropriation of the Delivered Jewelry and White Gold Watch.

B. Section 523(a)(2)(A)

Section 523(a)(2)(A) provides: "A discharge under section 727 … of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."

To prevail on a § 523(a)(2)(A) claim, a creditor must prove that:
  (1) the debtor made the representations;
  (2) that at the time he knew they were false;

---

[14] All citations refer to the page numbers that are automatically affixed to the top of each page by the Electronic Case Filing (ECF) system upon filing, rather than to the pagination used by the document's preparer.

  (3) that he made them with the intention and purpose of deceiving the creditor;
  (4) that the creditor relied on such representations; and
  (5) that the creditor sustained the alleged loss and damage as the proximate result of the misrepresentations having been made.

*Ghomeshi v. Sabban (In re Sabban)*, 600 F.3d 1219, 1222 (9th Cir. 2010).

 The Court finds that Arto obtained the Delivered Jewelry from Linda and David through false pretenses; that Arto obtained the White Gold Watch from Colin through false pretenses; and that Arto's corresponding indebtedness to Linda, David, and Colin is non-dischargeable pursuant to §523(a)(2)(A). Arto falsely represented to Linda and David that he intended to sell the Delivered Jewelry on their behalf and remit to them $14,000 of the sales proceeds, and made similar false representations to Colin regarding the White Gold Watch. From the outset, Arto had no intent to remit any of the sales proceeds as he had agreed to do. The Court infers Arto's fraudulent intent from his creation of the false December 2012 Invoice and his fabricated claim that Linda and David purchased the Ruby Ring. *See Am. Express Travel Related Svcs. Co. Inc. v. Hashemi (In re Hashemi)*, 104 F.3d 1122, 1125 (9th Cir. 1996), as amended (Jan. 24, 1997) ("[A] court may infer the existence of the debtor's intent … if the facts and circumstances of a particular case present a picture of deceptive conduct by the debtor."). Arto made the false representations to trick Linda, David, and Colin into giving him the Misappropriated Jewelry. Linda and David reasonably relied upon Arto's false representations, given that they had known Arto for more than three years, had transacted more than $380,000 in business with him without issue, and were on friendly terms. Colin's reliance was reasonable because he knew that Linda and David, his parents, had a longstanding relationship with Arto. Finally, Linda, David, and Colin sustained the damage—the loss of the Misappropriated Jewelry—as a proximate result of their reliance upon Arto's false representations.

C. Section 523(a)(6)

 "Section 523(a)(6) excepts from discharge debts arising from a debtor's 'willful and malicious' injury to another person or to the property of another. The 'willful' and "malicious' requirements are conjunctive and subject to separate analysis." *Plyam v. Precision Development, LLC (In re Plyam)*, 530 B.R. 456, 463 (9th Cir. B.A.P. 2015) (internal citations omitted).

 An injury is "willful" when "a debtor harbors 'either subjective intent to harm, or a subjective belief that harm is substantially certain.' The injury must be deliberate or intentional, 'not merely a deliberate or intentional act that leads to injury.'" *Id.* at 463 (internal citations omitted). An injury is "malicious" if it "involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" *Carrillo v. Su (In re Su)*, 290 F.3d 1140, 1146–47 (9th Cir. 2002) (internal citations omitted). "The conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, constitutes a willful and malicious injury within the meaning of §523(a)(6)." *Bino v. Bailey (In re Bailey)*, 197 F.3d 997, 1000 (9th Cir. 1999).

 Arto's failure to return the Misappropriated Jewelry or the sales proceeds thereof was a wrongful act, done intentionally, which necessarily caused injury, and which was done without just cause or excuse. By selling the Misappropriated Jewelry and failing to remit the sales proceeds as agreed, Arto engaged in conversion and inflicted deliberate and intentional injury upon the property of Linda, David, and Colin. Arto's indebtedness is non-dischargeable pursuant to §523(a)(6).

## IV. Conclusion

Based upon the foregoing, the Court finds that Arto is indebted to Colin in the amount of $14,500, and that such indebtedness is excepted from discharge pursuant to §523(a)(2)(A), (a)(4) (on the grounds of embezzlement), and (a)(6). The Court finds that Arto is indebted to Linda and David in the amount of $14,000, and that such indebtedness is excepted from discharge pursuant to §523(a)(2)(A), (a)(4) (on the grounds of embezzlement), and (a)(6). The Court will enter judgment consistent with this Memorandum of Decision.

###

Date: November 29, 2017

Ernest M. Robles
United States Bankruptcy Judge

# Appendix A (Trial Exhibit 108)—Carbon Copy August 2012 Invoice

TALA

TALA JEWELERS
1302 Montana Ave.
SANTA MONICA, CA 90403
310-319-0407

NAME

DATE 8/18/12

ADDRESS

| SOLD BY | CASH | CHARGE | LAYAWAY | ON ACCT | MDSE RET'D |
|---|---|---|---|---|---|
| | | | | | |

| ARTICLE | STOCK NO. | AMOUNT |
|---|---|---|
| Ring 10.52 ct | | |
| | | 92,000 – |
| | | not wanted |
| | | Did not want |
| Bracelet 10 ct Ruby | | Refer. |
| 5 ct Diamonds | | |
| 22,000 + 2,035 | | 24,000 – |

SPECIAL INSTRUCTIONS

#2 – OCT – NOV

RETURNS ARE FINAL · STORE CREDIT OR EXCHANGE WITHIN SEVEN DAYS ONLY · SPECIAL ORDERS CANNOT BE RETURNED FOR CREDIT OR EXCHANGE · THANK YOU FOR SHOPPING WITH US

| | |
|---|---|
| AMOUNT OF SALE | |
| TAX | |
| TOTAL | |
| AMOUNT PAID | |
| BALANCE | 11,500 – |

RECEIVED BY

PRODUCT 6077

All claims and returned goods MUST be accompanied by this bill

THANK YOU

# Appendix B (Trial Exhibit E)—Augmented August 2012 Invoice

TALA

TALA JEWELERS
1302 Montana Ave.
SANTA MONICA, CA 90403
310-319-0407

NAME

DATE 8/18/12

ADDRESS

| SOLD BY | CASH | CHARGE | LAYAWAY | ON ACCT. | MDSE. RET'D. | |
|---|---|---|---|---|---|---|
| | | | | | | |

| ARTICLE | STOCK NO. | AMOUNT |
|---|---|---|
| Ruby Ring 10.50 ct | | |
| 2.75 SIDE | | 91,000 |
| Gurhan Neckl | BA19430 | 3800 |
| [crossed out] | | [crossed out] |
| GURHAN GRAY | Sea Diamonds | [illegible] |
| DIAMOND NEC 1688 + 2035 | Ret. Bracelet | 21000 |
| 1685 | AMOUNT OF SALE | [illegible] |
| | TAX | 7715 |
| | TOTAL | [illegible] 12150 |
| | AMOUNT PAID | [illegible] |
| RECEIVED BY: 122256 | BALANCE | [illegible] |

SPECIAL INSTRUCTIONS
SEP - OCT - NOV

ALL SALES ARE FINAL - STORE CREDIT OR EXCHANGE WITHIN SEVEN DAYS ONLY - SPECIAL ORDERS CANNOT BE RETURNED FOR CREDIT OR EXCHANGED.
THANK YOU FOR SHOPPING WITH US.

B PRODUCT 607T

All claims and returned goods MUST [illegible] by this bill.

1801

122256
−35000
87256

THANK YOU



**Appendix C (Trial Exhibit 73)—December 2012 Invoice**

TALA

TALA JEWELERS
1302 MONTANA AVE
SANTA MONICA, CALIFORNIA 90403
(310) 319-0407

DAVID + LINDA 3/18/12

Ruby ring 10 ct Ruby & 2.75 ct diam 1100 —

Ruby bracelet 101 Ruby set diam 3700 Return 7/20/12

18K NECKLACE LINKS 3800 —

16850 —

AMOUNT OF SALE

TAX

TOTAL

ALL SALES ARE FINAL. STORE CREDIT OR EXCHANGE WITHIN 7 DAYS OF THE PURCHASE. SPECIAL ORDERS CANNOT BE RETURNED FOR CREDIT OR EXCHANGE. THANK YOU FOR SHOPPING WITH US

BALANCE 122256

1748 BALANCE 69756 THANK YOU

# Appendix D—Stipulated Purchase History

| Date | Purchase Amount | Paymount Amount | Running Balance* |
|---|---|---|---|
| 11/8/2010 | $14,212.62 | $14,212.62 | $0.00 |
| 11/22/2010 | $6,036.25 | $6,036.25 | $0.00 |
| 11/22/2010 | $1,646.25 | $1,646.25 | $0.00 |
| 12/9/2010 | $7,155.00 | $7,155.00 | $0.00 |
| 12/9/2010 | $4,653.00 | $4,653.00 | $0.00 |
| 12/22/2010 | $1,865.75 | $1,865.75 | $0.00 |
| 1/3/2011 | $21,950.00 | $0.00 | -$21,950.00 |
| 1/8/2011 | $2,996.00 | $24,946.00 | $0.00 |
| 1/19/2011 | $19,755.00 | $19,755.00 | $0.00 |
| 1/25/2011 | $27,437.00 | $27,437.00 | $0.00 |
| 2/17/2011 | $768.25 | $768.25 | $0.00 |
| 2/26/2011 | $10,920.12 | $10,920.12 | $0.00 |
| 3/5/2011 | $740.81 | $740.81 | $0.00 |
| 4/20/2011 | $1,212.75 | $1,212.75 | $0.00 |
| 6/6/2011 | $2,587.20 | $2,587.20 | $0.00 |
| 7/11/2011 | $1,345.96 | $1,345.96 | $0.00 |
| 8/12/2011 | $9,111.45 | $9,111.45 | $0.00 |
| 8/30/2011 | $5,462.50 | $5,462.50 | $0.00 |
| 9/9/2011 | $812.50 | $812.50 | $0.00 |
| 9/26/2011 | $3,277.50 | $3,277.50 | $0.00 |
| 9/26/2011 | $11,471.25 | $11,471.25 | $0.00 |
| 9/26/2011 | $2,185.00 | $2,185.00 | $0.00 |
| 10/7/2011 | $9,725.00 | $9,725.00 | $0.00 |
| 12/16/2011 | $8,674.45 | $8,674.45 | $0.00 |
| 12/22/2011 | $2,269.10 | $2,269.10 | $0.00 |
| 1/18/2012 | $2,403.50 | $2,403.50 | $0.00 |
| 1/19/2012 | $1,092.00 | $0.00 | |
| 1/19/2012 | $21,139.00 | $22,231.00 | $0.00 |
| 2/11/2012 | $764.75 | $764.75 | $0.00 |
| 2/25/2012 | $300.00 | $300.00 | $0.00 |
| 3/12/2012 | $4,435.00 | $0.00 | |
| 3/12/2012 | $2,785.00 | $7,220.00 | $0.00 |
| 4/10/2012 | $6,096.15 | $6,096.15 | $0.00 |
| 4/18/2012 | $8,849.25 | $8,849.25 | $0.00 |
| 5/13/2012 | $10,903.15 | $10,903.15 | $0.00 |
| 6/26/2012 | $15,076.00 | $0.00 | |
| 6/26/2012 | $5,462.00 | $10,000.00 | $10,538.00 |

| 7/1/2012 | $4,479.25 | $4,479.25 | $10,538.00 |
|---|---|---|---|
| 7/20/2012 | $27,968.00 | $0.00 | $38,506.00 |
| 7/20/2012 | $8,118.75 | $15,000.00 | $31,624.75 |
| 8/9/2012 | $3,740.00 | $3,740.00 | $31,624.75 |
| 8/18/2012 | $22,611.75 | $0.00 | $54,236.50 |
| 8/26/2012 | $0.00 | $30,000.00 | $24,236.50 |
| 9/20/2012 | $0.00 | $10,000.00 | $14,236.50 |
| 10/21/2012 | $0.00 | $10,000.00 | $4,236.50 |
| 11/12/2012 | $0.00 | $5,000.00 | -$763.50 |
| 11/24/2012 | $1,037.00 | $1,037.00 | -$763.50 |
| 11/24/2012 | $985.00 | $985.00 | -$763.50 |
| 11/24/2012 | $1,092.00 | $1,092.00 | -$763.50 |
| 12/19/2012 | $0.00 | $10,000.00 | -$10,763.50 |
| 12/24/2012 | $5,462.50 | $0.00 | -$5,301.00 |
| 12/24/2012 | $6,633.66 | $12,096.16 | -$10,763.50 |
| 1/12/2013 | $0.00 | $1,500.00 | -$12,263.50 |
| 1/12/2013 | $0.00 | $10,000.00 | -$22,263.50 |
| 1/12/2013 | $0.00 | $5,000.00 | -$27,263.50 |
| 1/12/2013 | $0.00 | $5,000.00 | -$32,263.50 |
| 1/29/2013 | $250.00 | $250.00 | -$32,263.50 |
| 3/1/2013 | $38,004.00 | $5,000.00 | $740.50 |
| 3/24/2013 | $0.00 | $5,000.00 | -$4,259.50 |
| 4/24/2013 | $0.00 | $5,000.00 | -$9,259.50 |
| 7/19/2013 | $0.00 | $7,500.00 | -$16,759.50 |
| 7/21/2013 | $2,450.00 | $2,450.00 | -$16,759.50 |
| | | | |
| **TOTALS** | $380,408.42 | $397,167.92 | -$16,759.50 |

*Negative numbers indicate that Linda and David had a credit with Tala; positive numbers indicate that Linda and David owed Tala money.

Note: Some of the figures in this table differ slightly from the figures in Defendant's comparable Exhibit C. The reason is that for the purchase on 8/18/2012, Defendant's Exhibit C uses the purchase amount of $23,066.75. This table uses the slightly different purchase amount of $22,611.75 because that is the amount set forth in the Pretrial Order (see Pretrial Order at para. 89).